IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MELISSA KIRKPATRICK,           )
                               )
         Plaintiff,            )
                               )
v.                             )       CASE NO. 2:17-cv-502-GMB
                               )       [wo]
NANCY A. BERRYHILL, Acting     )
Commissioner of Social Security, )
                               )
         Defendant.            )

## MEMORANDUM OPINION AND ORDER

Melissa Kirkpatrick applied for disability insurance benefits under Title II of the

Social Security Act ("the Act") alleging a disability date of June 18, 2014. R. 206–07

& 237. She later amended her alleged disability date to August 17, 2015. R. 24. The

application was denied initially and again on reconsideration. R. 82–95. A hearing was

held before an Administrative Law Judge ("ALJ"). R. 49–81. The ALJ rendered an

unfavorable decision on October 5, 2016. R. 21. The Appeals Council denied Plaintiff's

request for review. R. 4. As a result, the ALJ's decision became the final decision of the

Commissioner of Social Security (the "Commissioner"). Judicial review proceeds

pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 636(c). After careful scrutiny of the record

and briefs, for the reasons explained below, the Court concludes that the Commissioner's

decision is to be AFFIRMED.

## I. NATURE OF THE CASE

Kirkpatrick seeks judicial review of the Commissioner's decision denying her

1

application for disability insurance benefits. United States District Courts may conduct limited review of the Commissioner's decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The courts may affirm, reverse and remand with instructions, or reverse and render a judgment.

## II. STANDARD OF REVIEW

This court's review of the Commissioner's decision is a limited one, and the sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. § 405(g)). Thus, this court must affirm the Commissioner's decision if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla—it must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm even if the court would have reached a contrary result to that of the finder of fact, and even if the evidence preponderates against the Commissioner's findings.

*Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). On review, the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The court also must reverse a Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided that they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional

resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a) & 1382c(a)(3)(A)–(C). Despite the fact they are separate programs, the laws and regulations governing a claim for DIB and a claim for SSI mirror each other such that claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) & 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a) & 416.905(a). A person is entitled to disability benefits when the person is unable to

> [e]ngage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) & 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520 & 416.920 (2010).

(1) Is the person presently unemployed?
(2) Is the person's impairment(s) severe?
(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4)     Is the person unable to perform his or her former occupation?

(5)     Is the person unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id.*  The burden of proof rests on a claimant through Step 4.  *Phillips v. Barnhart*, 357 F.3d 1232, 1237–39 (11th Cir. 2004).  Claimants establish a *prima facie* case of qualification for disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238–39.  RFC is what the claimant remains able to do despite his impairments and is based on all relevant medical and other evidence. *Id.*  It may contain both exertional and nonexertional limitations. *Id.* at 1242–43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239.  To do this, the ALJ either uses the Medical Vocational Guidelines (the "grids") or receives testimony from a vocational expert ("VE"). *Id.* at 1239–40.  The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor independently can limit the number of jobs realistically available to an individual. *Id.* at

1240. Combining these factors yields a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

## IV. ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Kirkpatrick was 50 years old at the time of the ALJ's decision. R. 36 & 237. She had attended college for two years and she had worked as a bus driver for 15 years. R. 77 & 241. Kirkpatrick alleged that she was unable to work due to fibromyalgia, arthritis, degenerative disease of the neck and back, obesity, depression, anxiety, and migraines. R. 240. At the hearing, she amended her alleged onset date of disability to August 17, 2015. R. 24.

The ALJ found that Kirkpatrick had not engaged in substantial gainful activity since August 17, 2015. R. 26. The ALJ further found Kirkpatrick had the following severe impairments: degenerative disc disease, migraines, obesity, history of arthritis, mild neuropathy, bilateral feet, deviated third metatarsal left, status-post surgery right elbow and carpal tunnel syndrome, and fibromyalgia. R. 26. The ALJ concluded Kirkpatrick did not have an impairment or combination of impairments that met or equaled a listed impairment. R. 28. The ALJ further found that Kirkpatrick had the RFC to perform light work as follows: she could lift or carry no more than 20 pounds occasionally and ten pounds frequently; she could stand or walk no more than six hours in an eight-hour day; she could sit no more than six hours in an eight-hour day; she was limited to frequent handling and fingering bilaterally; she could frequently climb stairs and ramps; she could occasionally climb ladders, ropes, or scaffolds; she could occasionally stoop, kneel, crouch, or crawl; and she must avoid concentrated exposure to noise, unprotected heights, dangerous

equipment, extreme cold, and vibrations. R. 28. The ALJ found Kirkpatrick could not perform any past relevant work, but she could perform other work in the national economy. R. 35. The ALJ ultimately concluded Kirkpatrick was not disabled. R. 36.

## V. MEDICAL HISTORY

The court adopts, in large part, the facts as set out in Kirkpatrick's brief pertaining to her medical history. Doc. 14 at p. 2–10. In 2006 and 2007, Dr. Reitdorf, a psychologist, treated Kirkpatrick for major depressive disorder, moderate and recurrent. R. 598–624. On December 9, 2013, Kirkpatrick saw Dr. Weiss after a motor vehicle accident. R. 457. She went to the emergency room the day after the accident, where the staff noted that she suffered "multiple sprains in her neck, back shoulder and wrist." R. 457–60. A wrist x-ray on December 28, 2013 showed minimal degenerative changes. R. 727.

On January 20, 2014, Kirkpatrick presented at the Apollo Medical Group complaining of fatigue and joint pain. R. 363–64 & 367–70. She was diagnosed with fibromyalgia, osteoarthritis, chronic knee pain, migraines, and insomnia. R. 362 & 367. The doctor referred her to a specialist for a sleep study. R. 363–64 & 368–69. On March 3, 2014, Dr. Kul-Ormanoglu ordered bloodwork. R. 355 & 374. On February 7, 2014, he assessed Kirkpatrick as suffering from fibromyalgia, osteoarthritis, chronic knee pain, migraine, insomnia, vitamin D deficiency, and menopausal state. R. 360 & 365. Kirkpatrick had a polysomnography on April 2, 2014 that ruled out sleep-related breathing disorders. R. 379. On May 5, 2014, she received a diagnosis of hypersomnia, migraines, malaise and fatigue, and obesity. R. 371–72.

On May 5, 2014, Kirkpatrick went to the Apollo Medical Group for leg cramps and

chronic medical problems. R. 358. Upon examination, her popliteal artery was palpable on the right and tender. R. 358. She was assessed with leg cramping and bilateral leg pain. R. 358.

On June 18, 2014, Kirkpatrick fell while at work and lacerated her forehead. R. 342. Dr. Plummer performed a workman's compensation evaluation for complaints of visual disturbance and cephalgia. R. 342. He diagnosed blunt head trauma with forehead laceration and ordered a CT scan. R. 342. Dr. Plummer indicated that Kirkpatrick could "[r]eturn to work without restrictions." R. 342 & 349. The scan of her brain showed "mild asymmetry of the frontal horns of the lateral ventricles," prominent hyperostosis frontalis interna," and a "1.7 cm area of calcification/ossification extending from the inner table of the left parietal bone" that "does touch the underlying brain." R. 338. An MRI was recommended if clinical suspicion warranted further evaluation. R. 340. Two days later, on June 20, 2014, Kirkpatrick returned to Dr. Plummer, and he diagnosed her with blunt head trauma and a probable concussion. R. 350. On the section of his form for work disposition, he circled "Return to work without restrictions" and "Return to work (light duty)." R. 350 & 353. There is a handwritten note beside the work disposition section that appears to require "sedentary duty." R. 350. On another page of the form, Dr. Plummer listed no functional limitations but again appeared to write "sedentary duty." R. 353.

At the request of Dr. Kul-Ormanoglu, Dr. Zubillaga at Neurobehavioral Medicine Center evaluated Kirkpatrick for "very severe, painful muscular cramps" on June 24, 2014. R. 331. On physical exam, Dr. Zubillaga noted that "[s]he has limitation of range of motion of the spine particularly in the cervical spine and she has more pronounced fullness on the

left side of the neck particularly the supraclavicular fossa compared with the right." R. 332. Dr. Zubillaga found "extreme tenderness on palpation of the cervical muscles . . . less sensation to pinwheel and vibration in the distal part of the extremities including differential between the middle and the lower part of the tibia." R. 332. Dr. Zubillaga diagnosed "Cramp Disorder" and opined that this could be related to Fibromyalgia. R. 333. He sent the report to Dr. Kul-Ormanoglu. R. 331–33.

On June 26, 2014, Dr. Henkel at Neurological Specialties examined Kirkpatrick for headaches and blurred vision after her head trauma. R. 594. He assessed her as having a concussion and headache and placed her on light duty work status with no driving a work vehicle. R. 597. On July 8, 2014, a brain MRI showed "Focal hyperintensity on T2 and FLAIR in the left periventricular white matter, paramedian region." R. 335. The MRI states that this finding may be caused by "brain trauma, demyelinating process of MS, microvascular ischemic change, vasculitis or sequela of migraine headaches." R. 335. On July 15, 2014, Dr. Henkel reviewed the MRI and noted these results are "frequently seen in in patients with a history of migraine." R. 592. He assessed Kirkpatrick with headache, concussion, and binocular vision disorder. R. 593. He advised a "light duty" work status and stated that she "should not drive her work vehicle." R. 593.

On July 30, 2014, Kirkpatrick followed up with Dr. Henkel, reporting "throbbing headaches on a nearly daily basis" and "frequent episodes of blurred vision." R. 586. He assessed concussion, headache and binocular vision disorder, and opined that she should "remain on light duty at work with a limitation of no operating a motor vehicle for job purposes." R. 589. On August 20, 2014, Dr. Henkel assessed headache and concussion,

stating that, "[a]lthough the patient continues to have frequent headaches, the history of her current headaches is much more consistent with chronic migraine as opposed to post concussive syndrome." R. 585.  He stated that, "[f]rom a neurological perspective, the patient is now at Maximum Medical Improvement with a 0% permanent impairment rating, and is cleared to resume regular duty at work without restriction." R. 585.

On November 24, 2014, Dr. Gehle did a psychological examination and diagnosed major depressive disorder, recurrent and moderate, and generalized anxiety disorder. R. 627.  He found that Kirkpatrick's "mental health symptoms based on report and clinical observations appear to be moderately to severely impacting activities of daily living, vocational performance and interpersonal interactions." R. 627.

On January 20, 2015, Kirkpatrick presented to Dr. Sheets for evaluation of peripheral field vision loss. R. 632 & 654.  She had been hit by another driver on January 10, 2015 and sustained whiplash. R. 632.  After an examination, she was diagnosed with visual filed defect. R. 634.  According to Dr. Sheets, "[a]ny vision loss would not be ophthalmic in nature but would be neurological in origin.  Recommend repeat VF." R. 364.  Dr. Sheets also stated that she should see a neurologist "to look for findings in the visual pathway of the brain" if her visional field does not improve. R. 634.  On January 23, 2015, Dr. Sheets performed a follow up visual field test. R. 630 & 657.  Visual field testing "represents possible optic neuropathy v. visual pathway damage v. no-organic visual loss." R. 631.  He diagnosed visual field defect in both eyes. R. 631.  He said visual fields were stable with no sign of ocular disease, but "[t]his could represent retrochiasmal visual pathway damage v. non-organic vision loss," and he recommended neurology consult and

a repeat MRI. R. 631.

On February 5, 2015, Kirkpatrick returned to Dr. Zubillaga. R. 638. The record relating to this visit is largely illegible. However, Dr. Zubillaga does state in one portion of this notes that Kirpatrick "report[ed] that her muscle cramps went away when she started stretching exercises I recommended." R. 638. On February 17, 2015, Kirkpatrick went to Dr. Kalafas of Clearwater Pain Management for evaluation of her back and neck pain. R. 724. An x-ray and MRI were ordered. R. 725. On February 19, 2015, a lumbar spine MRI showed bulging at L5-SI. R. 719. The cervical spine MRI showed that at "C4-5 there is a shallow central disc herniation encroaching on the ventral cord [and at] C6-7 there is a posterior annular fissure with broad central disc herniation/protrusion encroaching on the ventral cord." R. 720–21. On February 19, 2015, Dr. Kalafas diagnosed cervicalgia and cervical radiculopathy. R. 722. He gave "IV sedation due to severe patient anxiety" before steroid injections. R. 722.

On February 23, 2015, Workman's Comp records from CORA Health Services show work status "light duty" with a "CurPDC:sedentary-light." R. 735. At the time, Kirkpatrick was "unable to sit for longer than 25-30 [minutes]" and "unable to lift any weight greater than 5 [pounds]." R. 735. On March 2, 2015, Dr. Kul-Ormanoglu referred Kirkpatrick to Dr. Drucker for a neurological exam for peripheral vision loss. R. 714. Dr. Drucker stated that "[c]ongenital problems could account for the superior defects . . . Posterior Ischemic optic neuropathy or Bilateral Occipital Lobe Infarcts below the calcarine fissure acquired after trauma are also possible, however the pt's optic nerves appear normal." R. 716. He wanted Dr. Zubillaga to address MRI and CT discrepancies.

R. 716.

On April 2, 2015, Workman's Compensation records from CORA Health Services show a work status of "light duty" with a "CurPDC:sedentary-light" R. 729. Kirkpatrick's functional status was that she was "unable" to perform prolonged sitting, had decreased muscle strength, and decreased range of motion. R. 729–30. On April 14, 2015, D. Kul-Ormanogul wrote a letter stating that "due to [Kirkpatrick's] medical conditions she should not be operating a commercial vehicle." R. 640. That day, he also offered the opinion that Kirkpatrick "has depression and fibromyalgia that can contribute increased pain," and she is "incapable of even 'low stress' jobs." R. 641, 643 & 646. He believed that Kirkpatrick's pain and other severe symptoms would "interfere with attention and concentration needed to perform even simple work tasks." R. 646.

On November 9, 2015, Kirkpatrick saw Dr. Boyce for "blurry/hazy spells for past year or so." R. 651. He noted that Kirkpatrick "has hard time seeing fine print when watching Television or phone for extended periods of time it makes the blurriness happen sooner." R. 651. He diagnosed myopia of the left eye, presbyopia of both eyes, and visual filed defects in both eyes. R. 653. Dr. Boyce stated that "the loss of focusing ability is a normal part of aging and will continue." R. 653.

On November 19, 2015, Dr. Powers' exam showed "loss of peripheral vision" and a "diminishment in the deep tendon reflexes." R. 712. Kirkpatrick's spinal range of motion was reduced. R. 712. Dr. Powers reviewed her prior MRIs. R. 710. She diagnosed herniated discs at C3-4, C4-5, and C6-7 and disc bulges at L4-5 ad L5-S1 based on an MRI from February 19, 2015; abnormal findings of the brain based on MRIs from June 18, 2014,

July 8, 2014, and February 26, 2015; along with occipital and frontal tension cephalgia, bilateral upper and lower extremity radiculopathy, anxiety and depression, nontoxic multinodular goiter, vision loss as diminishment in peripheral vision, hearing loss, persistent dizziness, asthma and insomnia. R. 713.  Dr. Powers opined that

> Kirkpatrick will have difficulty doing any job that requires prolonged standing walking or sitting as this will aggravate her neck and low back pain and bilateral upper and lower extremity radiculopathies.  Ms. Kirkpatrick is to avoid lifting greater than 10 pounds.  She is also to avoid any significant bending, stooping, or twisting . . . . Ms. Kirkpatrick's diminished vision and hearing will not resolve and she should not continue to drive buses or perform jobs that require visual or auditory acuity. . . . Ms. Kirkpatrick is also not able to work in high stress environments secondary to her anxiety and depression.  Ms. Kirkpatrick is unable to work at this time due to the above listed chronic conditions.

R. 713.

On March 11, 2016, Dr. Pappou of the Florida Orthopaedic Institute diagnosed Kirkpatrick with cervical spondylosis, right shoulder pain and impingement, right elbow pain, country club elbow, right cubital tunnel and right carpal tunnel. R. 694.  Dr. Pappou stated that "she will have lifelong pain and incomplete relief of symptoms most certainly. I can't cure her symptoms, but improve them." R. 694.  He injected her right elbow and gave her wrist splints. R. 694.  An x-ray demonstrated "spondylosis especially at C4-5 and C5-6 with segmental kyphosis." R. 696.

On March 16, 2016, Kirkpatrick transferred her primary care to Dr. Jacob. R. 675. Dr. Jacob diagnosed migraine, depression, fibromyalgia, degenerative disc disease at L5-S1 level, COPD, asthma, arthritis, meningioma, hypothyroid, essential hypertension dermatitis, and carpal tunnel syndrome. R. 677.  On March 24, 2016, Dr. Jacob treated Kirkpatrick for constipation. R. 672.  He noted her chronic narcotics and need for a stool

softener. R. 673.  An abdominal x-ray showed increased amount of stool throughout the nondistended colon consistent with constipation. R. 663.  Kirkpatrick saw Dr. Pappou on April 8, 2016. R. 697.  He advised continuing splints and injections. R. 697.  An elbow ultrasound revealed a hypoechoic lesion. R. 699.

On April 18, 2016, Kirkpatrick followed up with Dr. Jacobs to review lab work. R. 668.  He diagnosed migraine, depression, fibromyalgia, degenerative disc disease at L5-S1 level, COPD, asthma, arthritis, meningioma, hypothyroid, essential hypertension, dermatitis, carpal tunnel syndrome, vitamin D deficiency, and psoriasis. R. 669–70.  On April 21, 2016, Kirkpatrick went to the National Institute of Pain for her neck and shoulder pain. R. 680 & 704.  There the doctor noted that "the exam demonstrates involvement of the cervical, thoracic, and lumbar facet joints and bilateral SI joints." R. 681.  The doctor recommended cervical thoracic and lumbar facet nerve blocks. R. 681.

On June 3, 2016, Kirkpatrick presented to Dr. Kales at Pasco-Hernando Foot & Ankle with complaints of moderate to severe pain, burning, numbness, and tingling in her feet. R. 700.  After examining her, Dr. Kales diagnosed mild neuropathy, left greater than right, and deviated third metatarsal on the left with associated metatarsalgia and tenosynovitis in the bilateral lower extremities. R. 701.  He gave her trigger point injections. R. 701.  On June 15, 2016, Kirkpatrick returned to Dr. Kales because her feet were still bothering her. R. 703.  He recommended speaking with her insurance company about orthotic coverage. R. 703.  He diagnosed idiopathic progressive neuropathy and metatarsalgia. R. 703.

On June 16, 2016, Dr. Pappou performed "right tennis elbow release and

reattachment" and "right endoscopic carpal tunnel release." R. 707. Dr. Pappou advised Kirkpatrick to avoid lifting more than one pound. R. 708. Kirkpatrick was admitted to La Amistad Behavioral Health Services on November 7, 2016, where she reimagined until November 23. R. 12.

At the hearing before the ALJ on July 13, 2016, Kirkpatrick testified that her insurance coverage prevents her from seeing Dr. Kul-Ormanogul, so Dr. Jacob is now her primary physician. R. 50–51. Kirkpatrick had resumed physical therapy on the Monday before the hearing. R. 52. She explained her inability to work as follows:

> With my fibromyalgia, I have a serious fog where I'm not able to remember things very well. I have the itching, the burning, the memory control. I am not able to stand very long. I'm not able to sit very long. The ride here was excruciating. I'm not even sure how I'm going to get back home with the ride because I have to sit so long. Someone has to drive me. As far as my care, my neck my back, and all of that, someone has completely had to take care of me at this point. Someone combs my hair. Someone gives me a bath. I'm not even able to wear underwear in bed at night because I can't pull my underwear down.

R. 52–53. Kirkpatrick further testified that she lacks muscle control in her last three fingers. R. 53. When Dr. Pappou repaired her elbow, he told her that "it's going to be better, but the pain is always going to be there." R. 53.

Kirkpatrick testified that she received workman's compensation benefits. R. 54. Her last day of work was August 17, 2015. R. 55. Her representative at the ALJ hearing agreed to amend Plaintiff's onset date to August 17, 2015, but noted that when she returned to work she was on light duty. Tr. 57.

Kirkpatrick testified that she had suffered injuries in two automobile collisions. R. 58. In January 2015, she was driving when another car struck her from behind. R. 58. This

caused her "neck, and shoulder and back injury." R. 58. In June 2014, she was involved in another collision where she hit her head on the fare box of the bus and lost her peripheral vision. R. 58–59.

In June 2016, Kirkpatrick had carpal tunnel surgery. R. 61. She testified that her condition had "gotten worse to the point I started dropping things, breaking things, and I didn't know why I didn't have the feeling in my fingers." R. 62. She testified that she spends about ten hours per day in bed, and two or three hours in a recliner. R. 64. She attends therapy four times per week for her neck, back shoulders, wrists and elbow. R. 64–65. She drives very little due to her vision, inability to sit for long period, and pain in her hand. R. 65–66.

Kirkpatrick testified that injections in her back and neck temporarily relieved some of the pain. R. 66–67. Dr. Pappou recommended a spinal cord stimulator, but she is waiting on her insurance carrier to approve the device. R. 67. While she does have insurance coverage, she struggles to pay the deductibles. R. 66. Her children help her financially and she often runs a balance on her credit cards. R. 66. She has a new grandchild who weighs six pounds, but Kirkpatrick cannot lift her. R. 69. She also suffers from depression. R. 70.

## VI. ISSUES PRESENTED

1. Whether the ALJ improperly rejected the opinion of the treating orthopedic surgeon, Dr. Pappou?

2. Whether the ALJ failed to give significant weight to the opinion of the treating or consultative physicians and instead relied upon the residual functional capacity assessments of the non-examining doctors?

3. Whether the ALJ erroneously found that Kirkpatrick's mental

impairment was not "severe"?

## VII. ANALYSIS

### A.  Treating Surgeon's Opinion

Kirkpatrick argues that the ALJ erred in failing to identify the weight assigned to Dr. Pappou's June 16, 2016 opinion that she should avoid lifting more than one pound. On June 16, 2016, Dr. Pappou performed a right elbow reattachment and right carpal tunnel release on Kirkpatrick. R. 708.  In the post-operative plan section of his report, Dr. Pappou recommended "[g]entle use of the extremity as tolerated, avoiding lifting more than 1 pound, and follow up in 8 to 10 days for wound check." R. 708.  Kirkpatrick is correct that the ALJ did not assign the weight given to this testimony.  However, for the reasons stated below, the court concludes that this omission is harmless error. *See Sanchez v. Comm'r of Soc. Sec.,* 507 F. App'x 855, 856 (11th Cir. 2013) ("We have also declined to remand for express findings when doing so would be a 'wasteful corrective exercise' in light of the evidence of record and when no further findings could be made that would alter the ALJ's decision.").

First, the court concludes that the ALJ's omission of the weight given to Dr. Pappou's opinion is harmless because the ALJ fully discussed Dr. Pappou's progress notes. R. 31–32.  The ALJ specifically noted the recent date of the procedure and that Kirkpatrick had failed to submit evidence demonstrating that she was not expected to recover and resume function following the surgery. R. 32 & 708–09.  In fact, Dr. Pappou indicated in the operative report that "[i]n the carpal tunnel, we had a complete release and excellent hemostatis." R. 708.  Furthermore, Dr. Pappou stated that he removed all the degenerative

tissue from the elbow and that there was "a nice side-to-side repair and good vascular access channels." R. 708.  Indeed, the record contains no progress notes from Dr. Pappou after the date of the operation.  At the July 13, 2016 hearing, the ALJ agreed to keep the record open so that Kirkpatrick could provide a statement from Dr. Pappou. R. 75–76.  However, in a letter dated July 20, 2016, Kirkpatrick's representative noted that Dr. Pappou refused to complete a physical RFC until he had treated Kirkpatrick for an additional six months. R. 325.

Second, the context of the operative report provides evidence that the one-pound lifting restriction was a temporary post-operative recommendation, not a permanent limitation. R. 708.  Indeed, Dr. Pappou advised gentle use of the extremity as tolerated but advised that she should avoid lifting more than one pound and should follow up in eight to ten days. R. 708.  The short follow-up time reinforces the temporary nature of these restrictions.  Therefore, the court concludes that, given the limited and temporary nature of Dr. Pappou's one-pound lifting restriction, the ALJ's failure to assign its weight is harmless error.

**B.      Consideration of Medical Opinions**

Kirkpatrick argues that the ALJ failed to consider the opinions of Dr. Powers, an examining physician, and Dr. Kul-Ormanogul, a treating physician.  "[A]bsent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citations omitted).  However, "good cause" to stray from the treating physician's opinion exists when (1) the treating physician's opinion was not bolstered by the evidence,

(2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Winschel*, 631 F.3d at 1179. If the ALJ does stray from the treating physician's opinion, he "must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440 (citations omitted). Moreover, the opinion of a non-examining physician alone can not provide "good cause" because the opinion of a non-examining physician is entitled to little weight if contrary to the opinion of the claimant's treating physician. *See Swindle v. Sullivan,* 914 F. 2d 222, 227 n.3 (11th Cir. 1990) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).

On April 14, 2015, Dr. Kul-Ormanogul opined that Kirkpatrick should not operate a commercial vehicle due to her medical conditions. R. 640. He also completed an RFC questionnaire, in which he noted Kirkpatrick was incapable of performing even low stress jobs, and that her pain and other symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks. R. 641, 643 & 646. On November 19, 2015, Dr. Powers performed an initial evaluation of Kirkpatrick and opined that she should avoid lifting more than ten pounds, could not work in high stress environments, and could not work at that time, among other limitations. R. 713. The ALJ afforded these opinions little weight.

The ALJ stated that she afforded the opinion of Dr. Kul-Ormanogul, Kirkpatrick's treating physician, little weight because (1) Kirkpatrick was working full time at the time of the opinion; (2) the opinion did not include any supporting objective or clinical findings from Dr. Kul-Ormanogul, or any other treating source, and lacked detailed explanation;

and (3) it was before the period at issue. R. 30 & 34. The court agrees with this assessment. Dr. Kul-Ormanogul issued his opinion in April 2015. R. 640 & 646. However, the ALJ noted that Kirkpatrick had been working around this time. R. 30, 55 & 57. Specifically, Kirkpatrick testified that she drew workmen's compensation for a few months and that she quit working in August 2015. R. 55. Kirkpatrick's testimony that she engaged in work activity prior to August 2015 undermines Dr. Kul-Ormanogul's April 2015 opinion of extreme limitations.

The ALJ also stated that she afforded little weight to the opinion of Dr. Powers, Plaintiff's one-time examining physician, because (1) she had no ongoing treatment history with Plaintiff; (2) there was no evidence in the record, as a whole or in her own findings, to support her opinion; and (3) the opinion that Plaintiff was unable to work is not a medical opinion but is a dispositive finding in the case. The court agrees with this assessment as well. A one-time examining source is not entitled to great weight because there is no treatment relationship between the doctor and patient. *See McSwain v. Bowen*, 814 F. 2d 617, 619 (11th Cir. 1987). Moreover, an opinion about whether a plaintiff is disabled is not a medical opinion entitled to significant weight because that issue is dispositive of the case. *See Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011).

Furthermore, based upon its independent and thorough review of the medical evidence, the court agrees with the ALJ's finding that the record evidence is inconsistent with the opinions of Dr. Kul-Ormanogul and Dr. Powers. At an examination with Dr. Pappou on March 11, 2016, Kirkpatrick's neck was supple. R. 693. She exhibited a nearly full range of motion of the neck, but had pain at the extremes. R. 693. She demonstrated

5/5 motor strength, intact sensation to light touch, but she had pain throughout the upper extremity. R. 694. At a March 24, 2016 examination with Dr. Jacob, Kirkpatrick was pleasant, well nourished, well developed, and in no acute distress. R. 673. Her extremities showed no clubbing, cyanosis, or edema. R. 673. She demonstrated grossly intact cranial nerves 2 through 12, normal motor strength, full range of motion of the neck, normal gait, normal strength, tone and reflexes and intact sensory examination. R. 673 & 677. On April 13, 2016, at an exam with Dr. Jacob, Kirkpatrick was pleasant, well-nourished, well-developed, and in no acute distress. R. 669. She exhibited a full range of motion of the neck. R. 669. She had no clubbing, cyanosis, or edema of the extremities. R. 669. She had grossly intact cranial nerves 2 through 12, normal motor strength, normal gait, a supple neck, normal strength, tone and reflexes, and an intact sensory examination. R. 669. On April 21, 2016, at an examination with the National Institute of Pain, Kirkpatrick had a supple neck, intact cranial nerves 2 through 12, normal gait, good flexion of the spine but had lower back pain with lumbar facet loading maneuvers. R. 705. On June 15, 2016, at an examination with Dr. Lawrence Kales, Kirkpatrick had mild tenderness of the feet. R. 703. Accordingly, the court concludes that substantial evidence supports the ALJ's conclusion that Kirkpatrick is not disabled.

## C. Mental Impairments

Kirkpatrick alleges that the ALJ erred in failing to find that her mental impairments were non-severe. The ALJ, however, found in Kirkpatrick's favor at step two and proceeded to the other steps in the sequential evaluation. Tr. 55–67; *Medina v. Soc. Sec. Admin*, 636 F. App'x 490, 492–93 (11th Cir. 2016) (holding that, even where other

impairments should have been characterized as severe, any error is harmless because the ALJ found severe impairments and moved onto step three of the test). Also, an ALJ is not required "to identify every severe impairment at step two . . . even assuming that [claimant] is correct that her additional impairments were 'severe,' the ALJ's recognition of that as a fact would not, in any way, have changed the step-two analysis." *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951–52 (11th Cir. 2014).

Moreover, the ALJ properly evaluated Kirkpatrick's mental conditions at step two in accordance with the special technique established by the regulations. R. 27–28. The regulations require the ALJ to use a specific technique for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a; *Moore v. Barnhart*, 405 F. 3d 1208, 1213 (11th Cir. 2005). The ALJ separately evaluates how a claimant's mental impairments impact the four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a. The regulations state that if the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, the impairment will generally be considered not severe unless the evidence indicates there is more than a minimal limitation in the claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1). Here, the ALJ found that Kirkpatrick had no more than mild limitations in the first three functional areas and no episodes of decompensation of extended duration. R. 27–28.

Kirkpatrick points to the opinion evidence from Dr. Kul-Ormanogul and Dr. Nicholas Gehle to undermine the ALJ's finding of no severe mental impairment. Specifically, on November 24, 2014, Dr. Gehl, a one-time examining source, evaluated

Kirkpatrick and opined that her mental health symptoms were moderately to severely impacting her activities of daily living, vocational performance, and interpersonal interactions. R. 627. In April 2015, Dr. Kul-Ormanogul opined that Kirkpatrick had extreme difficulties in social functioning and concentration, persistence or pace, and had three or more episodes of decompensation, each of which lasted at least two weeks. R. 643.

As a one-time examining source, Dr. Gehle did not have the ongoing, longitudinal relationship with Kirkpatrick necessary to be classified as a treating physician. *McSwain*, 814 F. 2d at 619. Furthermore, Dr. Kul-Ormanogul's opinions as to functional limitations which were expressed in a check-off form were not entitled to any particular weight since he did not explain any reasons supporting his conclusions. *See Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

Additionally, Dr. Gehle's November 24, 2014 examination findings call into question his own opinion and that of Dr. Kul-Ormanogul, and do not support a finding of a severe mental impairment. Dr. Gehle noted on examination that Kirkpatrick was alert and oriented to person, place, situation and time. R. 627. She demonstrated adequate attention and concentration, and she showed adequate mental flexibility. R. 627. Kirkpatrick exhibited adequate receptive language skills, adequate immediate memory, and adequate remote memory, although her recent memory appeared mildly impaired. R. 627. She also displayed adequate social skills, fair abstract reasoning, and adequate judgment related to self-care and social problem-solving. R. 627. Although Kirkpatrick demonstrated below average overall intelligence, she had coherent, logical, and goal-directed thought form and content. R. 627.

Furthermore, Kirkpatrick reported activities of daily living during the November 24, 2014 examination which also undermine Dr. Gehle's and Dr. Kul-Ormanogul's opinions. R. 626–27. Kirkpatrick reported that she could bathe, dress, and use the toilet independently. R. 626. She reported that she could move around the home without assistance, perform household chores and basic cooking, manage her finances, and shop for groceries independently. R. 626. She had a valid driver's license and could drive independently without difficulty for about two hours. R. 626. Accordingly, the court concludes that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were non-severe. Furthermore, the court concludes that substantial evidence supports the ALJ's decision that Kirkpatrick was not disabled.

## VIII. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, it is ORDERED that the Commissioner's decision is AFFIRMED.

A separate judgment is entered herewith.

DONE this 20th day of November, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE